## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

National Minority Supplier Development
Council Business Consortium Fund, Inc.,

        Plaintiff,

v.

Hessian & McKasy, P.A., Glen E. Schumann,
and David Larson,

        Defendants.

Civil No. 04-1670 (DWF/AJB)

**MEMORANDUM
OPINION AND ORDER**

_____

Paul A. Sortland, Esq., Sortland Law Office, counsel for Plaintiff.

Gary W. Hoch, Esq., Laurie Wynne Meyer, Esq., and Debra L. Weiss, Esq., Meagher & Geer, PLLP,
counsel for Defendants.

_____

### Introduction

The above-entitled matter came before the undersigned United States District Judge on

November 18, 2005, pursuant to a Motion for Summary Judgment brought by Defendants Hessian &

McKasy, P.A., Glen E. Schumann, and David Larson (collectively, the "Defendants").  In its Complaint

(the "Complaint"), Plaintiff National Minority Supplier Development Council Business Consortium

Fund, Inc. ("BCF") asserts the following five causes of action:  legal malpractice-breach of contract

(Count I), legal malpractice-negligence (Count II), conversion (Count III), breach of fiduciary duty

(Count IV), and action for accounting (Count V).  For the reasons set forth below, Defendants' motion

is granted.

## Background

This is a legal malpractice action arising out of the Defendants' legal representation of BCF in a

prior lawsuit.

BCF, with its principal place of business in New York City, is a non-profit organization that

assists minority-owned businesses with obtaining credit.  In achieving this goal, BCF purchases a

"participation interest" in loans made by banks to certified minority-owned businesses that would not

otherwise be able to obtain bank loans.  In 1994, BCF participated in a $500,000 loan that Bank

Windsor ("Windsor") extended to Diversified Business Products, Inc. ("DBP"), a minority-owned

business founded by Lee Phillips.  BCF purchased a 75% participation in the loan, and Windsor

retained a 25% participation in the loan.  DBP, a local distributor of electrical and electronic supplies,

sought the loan in order to conduct its business as an intermediary between two large corporations.  As

an intermediary, BCF obtained computer chips from Atmel Corporation ("Atmel") and sold them to

Computing Devices International ("CDI").

BCF and Windsor entered a Participation Agreement (the "Agreement") setting forth the terms

of their agreement.  Windsor drafted the Agreement.  The Agreement provides that Windsor may "use

its discretion with respect to exercising or not exercising any rights or, taking or not taking any action

with respect to the Loan."  (Declaration of Debra L. Weiss in Support of Motion for Summary

Judgment ("Weiss Dec."), Ex. D at ¶ 8(a).)  The Agreement provides that "[Windsor] is to act as

trustee of the Loan Documents on behalf of the BCF and as the agent in collection of the Participation Interest of the BCF in the Loan." (*Id.*) The Agreement also provides that "loans may or may not be made as determined by [Windsor] in its exclusive discretion. [Windsor] makes no representation or warranty with respect to the Loan and does not guarantee the collectability thereof." (*Id.* at ¶ 8(g).) The Agreement further provides that "[i]n performing its services under this Agreement, [Windsor] will use the same degree of care that [it] uses in servicing and administering loads for its own account." (*Id.* at ¶ 8(b).)

BCF asserts that it understood the loan repayment arrangement to mean that CDI would remit payments it owed on its account with DBP to Windsor directly, by wire transfer. In May 1994, Windsor notified CDI that DBP had assigned its accounts receivable to Windsor, and requested that CDI remit payments to Windsor at its address. From July 1994 to August 1995, CDI sent sixteen checks to Windsor at the bank's address. CDI made the checks payable to Windsor.

In August of 1995, DBP's President, Lee Phillips ("Phillips"), directed CDI to change the address line on the checks. Thereafter, the checks were sent to DBP's business address instead of to Windsor's address. The payee's name was subsequently changed on the checks as well. The checks were no longer made payable to Windsor, but rather were made payable to both Windsor and DBP. In May 1996, Windsor notified BCF that DBP was losing significant amounts of money. Windsor and BCF restructured the loan to allow for accelerated repayment of the principal. In June 1996, after the original loan was paid, Windsor and BCF approved a renewal of DBP's loan in a Loan Agreement (the "Loan Agreement"). (Weiss Dec., Ex. K at 1.) The Loan Agreement provides that:

>   The Borrower [DBP] covenants and agrees that so long as any indebtedness remains outstanding hereunder, unless Bank [Windsor] shall otherwise consent in writing, it will: . . .
>
>   10.    Ensure that all funds received from CDI will be remitted directly to the Bank. If inadvertently sent to [DBP] the Borrower will immediately remit the funds to the Bank.

(Weiss Dec., Ex. K at 2.)  BCF, as well as the parties, signed the Loan Agreement.

DBP deposited at least ten checks into its account at Windsor between October and December of 1996.  Then, in January 1997, Phillips convinced CDI to send payment directly to DBP, instead of to Windsor.  Phillips later convinced CDI to change the name of the payee to Procurement Service Center, Inc. ("PSC"), a company that Phillips had incorporated.  By changing the payment terms, Phillips was able to deposit several CDI checks into a separate bank account.  The parties believe that Phillips embezzled over $1 million and absconded with the money in March 1997.  At that time, DBP owed $417,776.06 on the loan.

On March 24, 1997, Windsor sued Phillips, DBP, PSC, and DBP's officers.  On June 5, 1997, Hennepin County District Court entered a $429,808.55 default judgment against DBP and PSC.  Windsor initially attempted to recover that judgment.  Windsor eventually abandoned its efforts, however, following unsuccessful attempts to locate Phillips.

On October 23, 1997, Windsor sued CDI, seeking attorney fees and collection costs for CDI's failure to send payment directly to Windsor.  While the CDI suit was pending, BCF, along with its corporate counsel, Jeffrey Underweiser ("Underweiser") of Underweiser & Underweiser, hired defendant law firm, Hessian & McKasy ("Hessian") and defendants attorneys David Larson ("Larson") and Glen E. Schumann ("Schumann") to sue Windsor for its alleged mishandling of the loan.  The

Defendants and BCF entered a contingency retainer agreement that provided Defendants would receive 24% of any monetary recovery, while Underweiser & Underweiser would receive 12%. Additionally, BCF deposited $3,000 into a trust account for Defendants' costs and expenses. Defendants agreed not to charge for certain "soft costs" including long distance phone calls, reproduction, facsimile, and postage expenses, but they did not forego reimbursement for legal-research costs. (Weiss Dec., Ex. T.) The parties further agreed that Defendants had the right to withdraw their representation at any time and then to seek reimbursement for their reasonable fees and unreimbursed costs. (*Id.*)

In its complaint against Windsor, served December 28, 1998, BCF asserted nine counts: (1) breach of contract; (2) RICO; (3) negligent misrepresentation; (4) breach of fiduciary duty-contract; (5) breach of fiduciary duty-common law; (6) negligence; (7) accounting; (8) constructive trust; and (9) indemnification. Shortly thereafter, the case was removed to federal court.

Meanwhile, Windsor and CDI settled their lawsuit for $225,000. After settling its case against CDI, Windsor served BCF with a Rule 68 offer of judgment for $62,722.16, BCF's share of the CDI proceeds, in an attempt to settle the lawsuit with BCF. BCF declined the offer.

On May 24, 1999, before any discovery had been conducted, Windsor filed a motion for summary judgment on all counts. In its response to Windsor's summary judgment motion, BCF voluntarily dismissed five of its claims—RICO, breach of fiduciary duty-contract, breach of fiduciary duty-common law, negligence, and constructive trust. Additionally, BCF argued that the court should postpone Windsor's motion in order to allow BCF to conduct discovery. Defendants, however, did not submit a Rule 56(f) affidavit. Defendants admit that they failed to consult with their client or client's counsel in dismissing the five causes of action and in opposing the motion on the other four remaining

5

causes of action.

On September 8, 1999, Defendants brought a disgorgement motion against Windsor, seeking BCF's share of the CDI settlement money—$62,722.16, plus interest.  In response, Windsor argued that BCF failed to allege disgorgement in its complaint and that the settlement money was no longer available because BCF was required to pay 75% of the fees Windsor had incurred in defending the action pursuant to the Agreement.  Windsor moved for summary judgment on the issue of BCF's liability for 75% of its attorney fees.  The court denied BCF's motion for disgorgement and Windsor's motion for attorney fees.

The parties argued the summary judgment motion on September 22, 1999.  On January 10, 2000, the court granted Windsor's motion for summary judgment in its entirety.  BCF and Windsor subsequently settled the dispute for $60,000.

Toward the end of 1999, the Hessian firm went out of business.  Larson and Schumann subsequently accepted positions at Moss & Barnett, intending to bring the BCF file with them.  On January 11, 2000, Windsor notified Underweiser by letter that Moss & Barnett had represented Windsor in the past and that Windsor would not agree to waive the conflict that Schumann and Larson now had with its continued representation of BCF.  In the letter, Windsor requested that Moss & Barnett remove itself as BCF's counsel in the case.  Schumann then filed an expedited motion for withdrawal of counsel.  In his affidavit in support of the motion, Schumann indicated that BCF had consented to the withdrawal.  Three days later, BCF demanded that Schumann amend his affidavit to reflect that BCF did not consent to Hessian's withdrawal.  Schumann asserts that he complied with

BCF's request the next day.[1]   The court granted Defendants' motion to withdraw and ordered a 60-day stay of future proceedings to allow BCF to obtain new counsel.  Following withdrawal, Defendants filed a Notice of Attorneys' Lien for its reasonable fees and unreimbursed costs.

On June 7, 2000, with new counsel, BCF appealed the court's January 10, 2000, summary judgment order (the "January 10, 2000 Order").  The Eighth Circuit affirmed.

On November 3, 1999, Defendants sent Underweiser a letter indicating that Hessian had spent $1,937.27 of the originally deposited $3,000 retainer on litigation costs.  Underweiser responded by demanding an itemized bill.  Defendants then sent Underweiser an itemized bill.  On April 20, 2000, Defendants sent Underweiser a check for $838.60, the amount of the unused portion of BCF's retainer.  In response, Underweiser asked for an accounting.  On August 3, 2000, Defendants sent another itemized bill, showing that they had incurred additional costs since the last billing and that the new total was $2,163.74.  Underweiser objected to facsimile, telephone, and computerized research costs.  Specifically, Underweiser objected to a $1,000 charge for "Westlaw Computer Research" incurred during a two-week period in early 1999, and a $689.86 charge incurred for "Research services" in July

---

1       BCF, on the other hand, contends that there is no evidentiary support for Defendants' position.  The record shows, however, that the district court was informed of BCF's opposition to Defendants' withdrawal.  At the hearing on the motion to withdraw, Schumann testified that "[BCF] called me and said we would like to clarify to the Court we don't really consent to this withdrawal, but we concede the withdrawal because we recognize that there's an impossibility of representation by Hessian & McKasy and a conflict that's not waived which makes representation by Moss & Barnett impossible as well."  (Weiss Dec., Ex. PPP at 7.)  While the district court indicated that BCF did not oppose Defendants' motion to withdraw in its order, the Court finds that the district court was apprised of BCF's opposition.  (Weiss Dec., Ex. UU at 2.)

1999.  (Weiss Dec., Ex. FFF.)  Eventually, Defendants reimbursed BCF $140.60 for certain "soft

costs" such as internal photocopying, faxing, and local telephone calls.

On March 24, 2004, BCF initiated this legal malpractice action against Defendants in Hennepin

County District Court.  The case was subsequently removed to federal court.

Defendants assert that they are entitled to summary judgment on BCF's claims of legal malpractice,

negligence, conversion, breach of fiduciary duty, and their action for an accounting.

**Discussion**

**I.      Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view

the evidence and the inferences, which may be reasonably drawn from the evidence in the light most

favorable to the nonmoving party.  *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747

(8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is

properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal

Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of

every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and

that it is entitled to judgment as a matter of law.  *Enterprise Bank*, 92 F.3d at 747.  The nonmoving

party must demonstrate the existence of specific facts in the record which create a genuine issue for trial.

*Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment may not rest on mere allegations or denials, but must set forth

8

specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Legal Malpractice

To prevail in a legal malpractice action, a plaintiff must prove:  (1) the existence of an attorney-client relationship; (2) acts amounting to negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages; and (4) that but for defendant's conduct, the plaintiff would have been successful in the action. *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 408 (Minn. 1994) (citing *Blue Water Corp. v. O'Toole*, 336 N.W.2d 279, 281 (Minn. 1983)).  Failure to prove any one element defeats a malpractice claim. *Blue Water*, 336 N.W.2d at 282.

Here, the parties seem to agree on the existence of an attorney-client relationship and that a fact issue exists regarding Defendants' negligence.  For the purposes of this motion, Defendants focus solely on the element of proximate cause.  In order to survive a summary judgment motion on causation in a legal malpractice claim, the plaintiff must show that he would have survived summary judgment on the underlying, but foregone, claims. *Rouse*, 520 N.W.2d at 410.   Defendants assert that BCF cannot prove that "but for" Defendants' negligence, it would have prevailed on any of the five claims that Defendants voluntarily dismissed, or on any of the four claims that the district court dismissed on summary judgment in its January 10, 2000 Order.  Additionally, Defendants assert that BCF has failed to establish that Defendants' withdrawal of its representation of BCF constituted legal malpractice.  The Court first addresses the claims that the Defendants voluntarily dismissed in BCF's underlying action against Windsor.

### A.     RICO

The RICO Act, 18 U.S.C. § 1961, *et seq.*, states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  "A violation of § 1962(c) . . . requires:  (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

Defendants assert that BCF has not produced any evidence establishing that Windsor participated in a plan or scheme to defraud BCF.  Defendants point out that DBP also defrauded Windsor and that Windsor lost money as a result.  BCF asserts that "[w]hile establishing liability under the federal RICO statutes might have been difficult, the Defendants had no right to simply unilaterally dismiss this cause of action, without first consulting with their client."  (Plaintiff's Memorandum in Opposition to Motion for Summary Judgment ("Plaintiff's Memorandum") at 26.)

Here, there is no genuine issue of material fact on the element of racketeering activity.  BCF has failed to produce any evidence establishing that Windsor participated in a plan or scheme to defraud BCF.  Thus, the Court finds that Windsor would have been entitled to judgment as a matter of law on BCF's RICO claim.

### B.     Breach of Fiduciary Duty

A claim for breach of fiduciary duty includes four elements:  (1) the existence of a duty; (2) breach of that duty; (3) causation; and (4) damages.  *Conwed Corp. v. Employers Reinsurance*

*Corp.*, 816 F. Supp. 1360, 1362 n.3 (D. Minn. 1993). Under Minnesota law, a fiduciary relationship

exists where the claimed fiduciary occupies a position of trust and confidence and has knowledge

superior to that of the other party. *Vacinik v. First Nat'l Bank of Pine City*, 416 N.W.2d 795, 799

(Minn. Ct. App. 1987). A fiduciary duty may arise out of an otherwise ordinary contractual relationship

where one party knows or should know that the other is placing trust and confidence in the first and

relying on the first for counsel and information. *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619,

623 (Minn. 1972). A fiduciary relationship does not arise, however, when the parties negotiating a

contract are dealing at arm's length. *Shema v. Thorpe Bros.*, 62 N.W.2d 86, 91 (Minn. 1953).

Defendants assert that the Agreement does not create a fiduciary relationship between BCF and

Windsor because it provides only that the Bank "act as trustee of the Loan Documents on behalf of the

BCF and as the agent in collection of the Participation Interest of the BCF in the Loan." (*See* Weiss

Dec., Ex. D at ¶ 8(a).) Defendants rely on *First Citizens Fed. Sav. and Loan Ass'n v. Worthen*

*Bank and Trust Co.*, 919 F.2d 510, 514 (9th Cir. 1990), in which the court held that in the context of

loan participation agreements among sophisticated lending institutions, fiduciary relationships should not

be inferred absent unequivocal contractual language. BCF relies on the same language in the Agreement

to support its assertion that Windsor knew that BCF was placing its trust and confidence in it and

relying on Windsor to provide counsel. BCF also asserts that it is a "small financing agency" that trusted

Windsor.

Here, nothing in the Agreement indicated that Windsor owed a fiduciary duty to BCF. The fact

that the Agreement indicates that the Bank is to "act as trustee of the Loan Documents on behalf of the

BCF and as the agent in collection of the Participation Interest of the BCF in the Loan" does not create a fiduciary duty.

Further, BCF has not alleged any facts that indicate that Windsor owed BCF a fiduciary duty. While BCF alleges that it is a "small financing agency," it has not put forth any evidence to demonstrate that it was an unsophisticated party. Rather, the facts indicate that BCF was a sophisticated party. In his affidavit, Marcial Robiou, President and Chief Executive Officer of BCF, states that BCF's core program is the Loan Guarantee Participation Program, which has provided financing to 723 borrowers for a total of $180.9 million and involved more than 150 lenders. (Robiou Aff. at ¶¶ 6, 14, 15.) In its January 10, 2000 Order, the district court found that the parties were "sophisticated equals" to the transaction. (Weiss Dec., Ex. F. at 10.) The Court agrees. Because the parties were sophisticated equals, the Court finds that they negotiated the Agreement at arm's length. Moreover, BCF drafted the Agreement and could have created a fiduciary relationship.

Although the existence of a fiduciary relationship is a question of fact and normally for the jury, *see Murphy v. Country House, Inc.*, 240 N.W.2d 507, 512 (Minn. 1976), the Court finds that as a matter of law, no such relationship existed between Windsor and BCF. Therefore, BCF's breach of fiduciary claim could not have survived summary judgment as a matter of law.

### C.      Negligence

In order to establish a negligence claim, a plaintiff must establish that: (1) defendant had a duty of care toward the plaintiff; (2) defendant breached that duty; (3) defendant's breach of duty was the proximate cause of plaintiff's injuries; and (4) plaintiff suffered an injury. *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 157 (Minn. 1982).

Defendants assert that BCF's negligence claim would not have survived summary judgment if Defendants had not previously withdrawn this cause of action, because, under Minnesota law, a plaintiff cannot pursue alternative causes of action, such as negligence, where the parties' duties were established by their contract.  Defendants cite *Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983), and *United States v. Johnson*, 853 F.2d 619, 622 (8th Cir. 1988), in support of this proposition. BCF, on the other hand, asserts that it is permitted to plead alternative causes of action under Minnesota law.

BCF is correct that it is entitled to plead in the alternative, however, BCF's negligence claim was not legally sustainable.  In its action against Windsor, BCF alleged that Windsor "acted negligently in Loan administration that it undertook to perform on behalf of Plaintiff BCF."  (Weiss Dec., Ex. Y at 15.)  Here, the duties that are claimed to have been breached exist, if at all, solely by virtue of the contract between the parties.  Because the exclusive source of Windsor's duties to BCF were established in the Agreement, BCF cannot claim that the breach of those duties supported a cause of action in negligence under Minnesota law.  *See Lesmeister*, 330 N.W.2d at 102; *Johnson*, 853 F.2d at 622.  Accordingly, BCF's negligence claim would not have survived summary judgment as a matter of law.

### D.     Constructive Trust

The constructive trust is "a flexible remedy, appropriate 'where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.'"  *Rock v. Hennepin Broadcasting Associates, Inc.*, 359 N.W.2d 735, 739 (Minn. Ct. App. 1984) (citing *Knox v. Knox*, 25 N.W.2d 225, 228 (Minn. 1946)

and quoting Restatement of Restitution § 160, at 640-41 (1937)).  Fraud need not be present to

impose a constructive trust, but rather there must be "clear and convincing evidence that the imposition

of the constructive trust is justified to prevent unjust enrichment."  *In re Estate of Eriksen*, 337

N.W.2d 671, 674 (Minn. 1983).  Constructive trusts are designed to correct abuses of fiduciary

relationships.  *See, e .g., Wilcox v. Nelson*, 35 N.W.2d 741, 744 (Minn. 1949); *Freundschuh v.

Freundschuh*, 559 N.W.2d 706, 711 (Minn. Ct. App. 1997); *Gerdin v. Princeton State Bank*, 414

N.W.2d 765, 768 (Minn. Ct. App. 1987);.

Defendants assert that there was no fiduciary relationship between Windsor and BCF, the

Agreement governed the rights between Windsor and BCF, and Windsor did not have any of BCF's

property in its possession.  BCF asserts only that there was a fiduciary relationship between BCF and

Windsor.

Here, the Court has already determined that there was no fiduciary relationship between BCF

and Windsor.  Furthermore, the unjust enrichment doctrine does not apply because the Agreement

governed BCF's and Windsor's rights.  *See Stein v. O'Brien*, 565 N.W.2d 472, 474 (Minn. Ct. App.

1997) (holding that the unjust enrichment doctrine applies only when there is no contract governing the

parties' rights).  Finally, BCF makes no allegation that Windsor had any of BCF's property in its

possession.  The Court finds that the constructive trust cause of action would not have survived

summary judgment as a matter of law.

The Court finds that none of the claims that the Defendants voluntarily dismissed would have

survived summary judgment but for the Defendants' alleged negligence.  Next, the Court turns to the

claims that the district court dismissed in its January 10, 2000 Order to determine if any of them would

have survived summary judgment but for the Defendants' alleged negligence.

**E.      Breach of Contract**

In the underlying action, BCF asserted that Windsor violated the terms of the Agreement by accepting indirect payments from CDI and failing to inform BCF of the change in terms of the Agreement.  The Agreement provides that:

> [Windsor] shall . . . use its best efforts to collect all sums due to [Windsor] in accordance with the terms of the Loan.  (b) [Windsor] shall not, unless previous notice thereof is given by [Windsor] to the BCF and the BCF consents to:
>
> (I)      Make or consent to any material alteration, addition, change or amendment of the terms of the Loan or of the Loan Documents or waive or release any of the rights of [Windsor] thereunder . . . .

(Weiss Dec., Ex. D at ¶ 5(a).)  The Loan Agreement, the terms of which BCF asserts are incorporated into the Agreement, provides:

> The borrower [DBP] covenants and agrees that so long as any indebtedness remains outstanding hereunder, unless [Windsor] shall otherwise consent in writing, it will:
> . . .
>
> 10.      Ensure that all funds received from [GDIS] will be remitted directly to [Windsor].  If inadvertently sent to [DBP], the borrower will immediately remit the funds directly to [Windsor].

(Weiss Dec., Ex. K at 1–2.)  BCF also asserted that Windsor breached the standard of care set forth in the Agreement.  The Agreement provides that Windsor must "use the same degree of care that [Windsor] uses in servicing and administering loans for its own account."  (Weiss Dec., Ex. D at ¶ 8(c).)  BCF asserted that the Agreement imposed a reasonable standard of care.

Windsor, on the other hand, asserted that the Agreement imposed a non-discrimination standard of care, requiring only that Windsor treat its money and BCF's money the same.  Additionally,

Windsor asserted that the Agreement empowers it to "use its discretion with respect to exercising or not exercising any rights or, taking or not taking any action with respect to the Loan." (*Id.* at ¶ 8(a).) Windsor also pointed out that the Agreement provides that "loans may or may not be made as determined by [Windsor] in its exclusive discretion. [Windsor] makes no representation or warranty with respect to the Loan and does not guarantee the collectability thereof." (*Id.* at ¶ 8(g).)

The district court held that DBP, not Windsor, made the covenant to deposit CDI's checks directly to Windsor, and CDI, not Windsor, failed to honor the notice of assignment. The district court also pointed out that Windsor had broad discretion in exercising rights under the loan or taking action with respect to the loan. The district court also found that the Agreement imposed an anti-discrimination standard of care and that Windsor had not breached that standard.

Defendants assert that BCF has not demonstrated that it had a viable breach of contract claim against Windsor. That failure, according to Defendants, means that BCF has not established that but for the Defendants' alleged negligence, BCF would have survived summary judgment on its breach of contract claim. BCF asserts that the district court "rejected the breach of contract claims in large part because of the lack of any meaningful facts or discovery." (Plaintiff's Memorandum at 34.) BCF also asserts that "[i]nstead of providing any affidavit testimony to counter the allegations of Bank Windsor, the Defendants simply relied upon the documents." (*Id.*) Additionally, BCF asserts "[w]hile the district court ruled, somehow, that the standard of care was somehow less than a negligence standard, this is not correct." (*Id.* at 36.)

The Court finds that BCF has not met its burden of providing evidence demonstrating that but for Defendants' alleged negligence, the district court would not have granted summary judgment in favor

16

of Windsor on BCF's breach of contract claim.  BCF asserts Defendants' negligence, but fails to show

how Defendants' alleged failure to engage in discovery would have altered the outcome on this claim.

Furthermore, the Court will not review arguments that the district court already rejected and which the

Eighth Circuit affirmed unless BCF produces new relevant evidence that Defendants previously failed to

discover.  The Court finds that BCF has not come forth with any new evidence regarding Defendants'

alleged failure to engage in discovery that would have made a difference to the district court.

### F.    Accounting

In its action against Windsor, BCF requested that the district court order Windsor to prepare a

formal accounting "for all sums received, held and disbursed on behalf of Plaintiff BCF in connection

with the Participation Agreement and the Loan to DBP."  (Weiss Dec., Ex. Y at 16.)  The parties agree

that BCF was entitled to an accounting pursuant to the Agreement, which provides:

> BCF shall have the right at any reasonable time during the normal business hours of
> [Windsor] and upon reasonable prior notice to [Windsor] to have access to, and, at the
> expense of the BCF, to examine and copy any and all books, records, and documents
> relating to the loan or this Agreement.

(Weiss Dec., Ex. D at ¶ 6(c).)

The district court explained that a court-ordered accounting is "an extraordinary remedy" that is

only available when legal remedies are not adequate.  (Weiss Dec., Ex. F at 6.)  The district court held

that BCF was not entitled to an accounting because BCF did not exercise its right to inspect Windsor's

books, records, and documents under the terms of the Agreement, thereby demonstrating that its

remedy at law was not inadequate.  (*Id.* at 7.)

17

Defendants assert that BCF has failed to explain how information gleaned from an accounting would have prevented the district court from dismissing BCF's substantive claims. Defendants also contend that BCF failed to request an accounting, at its own expense, before it retained counsel and after it learned of Phillip's theft. BCF asserts that Defendants were negligent by failing to substantiate their claim for an accounting to the district court.

The Court notes that BCF chose not to exercise its right to request an accounting, regardless of Defendant's decision not to request an accounting. In any event, the Court finds that BCF has failed to demonstrate what harm resulted in the absence of an accounting. Here, BCF has failed to show what facts an accounting would have uncovered that would have prevented the district court from granting summary judgment in the underlying matter. Therefore, the Court finds that the action for accounting would not have survived summary judgment as a matter of law.

## G.     Indemnification

In the underlying case, BCF asserted a cause of action for indemnification based on the Agreement's indemnification clause. The Agreement's indemnification clause provides that:

> [Windsor] agrees to indemnify and hold BCF harmless from any and all liabilities, claims, obligations, losses, actions, judgments, suits, settlements and expenses of any kind, resulting from the bank or its employee's negligence, fraud, theft, incorrect calculation, or mistake in the transfer and/or disbursement of funds related to the BCF.

(Weiss Dec., Ex. D at ¶ 14.)  The district court stated, "BCF interprets this provision to mean that Windsor must indemnify it for the loss it sustained when DBP's president cashed checks from CDI and left the country."  (Weiss Dec., Ex. F at 11.)  The district court also stated that "BCF reads the provision to mean that Windsor will indemnify BCF for 'any and all . . . losses . . . resulting from . . .

18

negligence, fraud, . . . or mistake in the transfer . . . of funds related to the BCF.'" (*Id.* at 11–12.)

In granting summary judgment on this claim, the district court found that the indemnification clause was not ambiguous and that the plain and ordinary meaning of its terms refers to losses due to the transfer of funds, not for improper loan administration. (*Id.* at 13.) The district court explained that the Agreement contains specific provisions that govern loan administration, and that these provisions permit Windsor broad discretion in exercising its rights or taking action under the loan insofar as Windsor's actions meet the standard of care set forth in the Agreement. (*Id.*) The district court also noted that pursuant to the Agreement, Windsor does not guarantee the collectability of the loan. (*Id.*)

Here, BCF offers the same interpretation of the indemnification clause that the district court rejected. BCF cites Robiou's affidavit in support of its contention that BCF was unaware that under Phillips' direction, DBP directed CDI to change the address and payee's name on the checks so that Phillips was able to abscond with money intended for Windsor. BCF asserts that this knowledge would have supported a claim for negligence by Windsor, and thus entitled BCF to indemnification pursuant to the Agreement. BCF asserts that the district court granted summary judgment in favor of Windsor on this claim, because Defendants "did not present any evidence to the court, did not provide any evidentiary affidavits, depositions, or properly vetted documents whatsoever." (Plaintiff's Memorandum at 39.)

Defendants assert that nothing they failed to do would have made BCF's indemnification claim meritorious because the district court rejected BCF's interpretation of the Agreement's indemnification clause. The Court agrees. In finding the indemnification clause unambiguous and in reading the Agreement as a whole, the district court concluded that Windsor was not required to indemnify BCF for

19

incompetent loan administration.  Because the district court based its decision on the unambiguous

contract language, the Court finds that BCF cannot, and has not, presented any evidence that

establishes, but for Defendants' negligence, the outcome would have been different.

## H.      Negligent Misrepresentation

Minnesota courts impose liability for negligent misrepresentation when:

> One who, in the course of his business, profession or employment, or in a transaction in
> which he has a pecuniary interest, supplies false information for the guidance of others in
> their business transactions, is subject to liability for pecuniary loss caused to them by
> their justifiable reliance upon the information, if he fails to exercise reasonable care or
> competence in obtaining or communicating the information.

*Bonhiver v. Graff*, 248 N.W.2d 291, 298–99 (1976) (quoting Restatement (Second) of Torts § 552).

In the underlying case, BCF asserted a cause of action for negligent misrepresentation based on

five "representations" from Windsor.  Four of the alleged misrepresentations were made in Executive

Summaries of the loan, dated between May 1994 to May 1995, and indicate that CDI will make direct

payments to Windsor.  The fifth alleged misrepresentation arose from a term in the Loan Agreement,

signed by DBP, which provided that:

> The borrower [DBP] covenants and agrees that so long as any indebtedness remains
> outstanding hereunder, unless [Windsor] shall otherwise consent in writing, it will:
> . . .
>
> 10.     Ensure that all funds received from [CDI] will be remitted directly to [Windsor].
>         If inadvertently sent to [DBP], the Borrower will immediately remit the funds
>         directly to [Windsor].

(Weiss Dec., Ex. K at 2.)  The district court granted summary judgment in favor of Windsor on this

claim, finding that Windsor's first four alleged misrepresentations were true when made and that

Windsor did not make the fifth alleged misrepresentation.  (Weiss Dec., Ex. F at 11.)  Furthermore, the

district court found that additional discovery concerning Windsor's representations was not warranted. (*Id.* at 10–11.)

Defendants assert that BCF cannot establish how Defendants' failure to conduct discovery or provide a Rule 56(f) affidavit would have resulted in a different outcome when the district court held that additional discovery would be "irrelevant." BCF asserts that Robiou's affidavit provides the evidentiary support that would have changed the district court's decision, had Defendants submitted such evidence. BCF points to Robiou's affidavit, in which Robiou stated that in August 1995, CDI's payments were being sent and made payable to DBP, not Windsor. BCF further asserts that, according to Robiou, BCF would not have agreed to enter into the Loan Agreement if it had known that Windsor was not following the loan covenants.

The Court, however, finds that the district court would not have made a different decision had it considered Robiou's allegations. Robiou's allegations do nothing to change the veracity of the first four alleged misrepresentations at the time they were made. Here, Robiou asserts that in August 1995, Windsor allowed CDI's payments to be sent and made payable to DBP, in violation of the Agreement. But the first four alleged misrepresentations were made between May 1994 and May 1995, before Robiou claims that Windsor allegedly violated the Agreement. Therefore, Robiou's allegations would not have altered the district court's finding that the first four representations were true when Windsor made them. Furthermore, BCP never identifies any statements that it considers misrepresentations after August 1995. Thus, the Court finds that BCF's negligent misrepresentation claim would not have survived summary judgment as a matter of law.

**I.      Disgorgement**

BCF asserts that Defendants' failure to assert a cause of action for disgorgement in the underlying case caused it to lose $2,000.  In its Complaint, BCF alleges that the district court awarded it the $62,000 it sought to recover in the disgorgement action.  BCF also alleges that it settled the disgorgement issue with Windsor for $60,000, but asserts that had Defendants properly pursued the disgorgement action BCF would have received an additional $2,000.  Additionally, BCF asserts that this money remains in an escrow account and that Defendants have placed a lien on it.

Defendants assert that BCF has failed to demonstrate how their alleged negligence caused BCF to settle BCF's disgorgement claim with Windsor for $60,000 instead of $62,000.  Additionally, Defendants assert that BCF has not proffered any evidence establishing how the Defendants committed malpractice by asserting a lien on these funds.  Defendants contend that if BCF has a defense to the lien, the proper place to raise it is in the lien action or in defense of Defendants' counterclaim.

The Court finds that BCF has not demonstrated that but for Defendants' alleged negligence it would have received an additional $2,000.

**J.      Defendants' Withdrawal**

BCF alleges that Schumann and Larson improperly withdrew after they left Hessian and began employment with Moss & Barnett.  Schumann and Larson assert that it was not negligent for them to withdraw after Windsor, a client of their new firm, refused to consent to Schumann and Larson's continued representation of BCF.  Schumann and Larson cite Minn. R. Prof. Conduct 1.7(a)(2), which provides that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless . . . each client consents after consultation."  Further, Schumann and

Larson assert that their withdrawal did not cause BCF any harm because the district court ordered a stay of proceedings and BCF was able to retain other counsel to handle its appeal of the district court's January 10, 2000 Order.

The Court finds that BCF has not demonstrated any harm from Schumann and Larson's alleged improper withdrawal. Therefore, as a matter of law, Schumann and Larson's alleged negligence cannot constitute legal malpractice. Accordingly, the Court finds that Defendants are entitled to summary judgment on BCF's legal malpractice claim. None of the claims, either those voluntarily dismissed or those dismissed by the district court in its January 10, 2000 Order, would have survived summary judgment as a matter of law, and Defendants' alleged improper withdrawal did not constitute legal malpractice.

## III.     Accounting

A court-ordered accounting is an "extraordinary remedy," and as such, is only available when legal remedies are not adequate. *Lefkowitz v. City-Equity Group*, 146 F.3d 609, 611 (8th Cir. 1998).

Defendants assert that BCF is not entitled to an accounting because Defendants have provided such an accounting on two separate occasions and because Defendants have reimbursed all unused funds—$979.20 of the $3,000 trust account. BCF, on the other hand, asserts that it is entitled to an accounting because Defendants have not addressed BCF's questions regarding Defendants' legal research charges, despite BCF's attempts to obtain this information.

The Court finds that a genuine issue of material fact exists as to which party is entitled to the $2,020.80 left in the retainer and what, if anything, Defendants are entitled to rightfully encumber by

23

way of its lien.  The Court dismisses BCF's claim without prejudice, however, because after dismissing

BCF's legal malpractice claim, the amount in controversy in this diversity action is less than the requisite

$75,000.

## IV.     Conversion

Under Minnesota law, conversion is defined as "an act of willful interference with the personal

property of another which is without justification or which is inconsistent with the rights of the person

entitled to the use, possession or ownership of the property." *Bloom v. Hennepin County*, 783 F.

Supp. 418, 440 (D. Minn. 1992) (quoting *Dain Bosworth, Inc. v. Goetze*, 374 N.W.2d 467, 471

(Minn. Ct. App. 1985)).  Conversion may involve "tangible property, or intangible property customarily

merged in, or identified with some document." *Id.*

BCF alleges that Defendants converted the remaining $2,020.80 left in the retainer.  The Court

finds that there is a genuine issue of material fact as to whether Defendants properly retained an amount

equal to the costs that they were contractually entitled to recover in representing BCF.  The Court

dismisses BCF's claim without prejudice, however, because after dismissing BCF's legal malpractice

claim, the amount in controversy in this diversity action is less than the requisite $75,000.

## V.     Breach of Fiduciary Duty

An attorney has a fiduciary duty "to represent the client with undivided loyalty, to preserve the

client's confidences, and *to disclose any material matters bearing upon the representation of these*

*obligations*."  *Rice v. Perl*, 320 N.W.2d 407, 410 (Minn. 1982) (emphasis in original).

Defendants assert that BCF has not alleged that Defendants breached either their duty of

undivided loyalty or their duty of confidentiality.  Defendants point to BCF's Complaint, which alleges

24

that Defendants breached their fiduciary duties by:

    a.    Deviation from the appropriate standard of care, as outlined above;

    b.    Excessive charges for legal work and expenses, beyond that which was contracted for;

    c.    Attempts to impose an attorneys lien upon property to which the Defendants do not have an appropriate claim; and,

    d.    Taking money from clients without proper accounting or consent.

(Weiss Dec., Ex. MM at ¶ 66.)  Defendants assert that the last three allegations involve the contractual dispute between BCF and Defendants over the retainer agreement, and do not involve the Defendants' fiduciary duties of loyalty and confidentiality.  Defendants further contend that the first allegation is merely a repackaging of BCF's legal-malpractice claim.  Defendants cite R. Mallen & J. Smith, *Legal Malpractice*, § 14.2 at 490 (2005 ed.), for the propositions that "[c]ompetent representation, which is the avoidance of negligence, is not a fiduciary obligation[,]" and that "claims of negligence, which do not implicate a duty of confidentiality or loyalty, do not support a cause of action for fiduciary breach."

BCF admits that it does not assert a breach of confidentiality, but asserts that it has demonstrated a breach of undivided loyalty.  BCF asserts that Defendants' withdrawal from their representation of BCF was a breach of undivided loyalty.  BCF asserts that upon becoming employed by Moss & Barnett, Schumann and Larson "simply decided to stay with the firm and the larger client, rather than fulfill their fiduciary obligations to [BCF]."  (Plaintiff's Memorandum at 46.)

The Court finds that BCF's last three allegations in the Complaint involve the contractual dispute between BCF and Defendants over the retainer agreement, and do not involve the Defendants' fiduciary duties of loyalty and confidentiality.  The Court also finds that, as a matter of law, Schumann and Larson

did not breach their fiduciary duty of undivided loyalty to BCF by withdrawing their representation. BCF cites no authority to support is position that Schumann and Larson were required to abandon their employment with Moss & Barnett in order to fulfill their fiduciary duty to BCF.  Here, the district court approved the withdrawal after being informed of BCF's opposition to the withdrawal.  Thus, Schumann and Larson did not breach their fiduciary duty to BCF.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.    Defendants Hessian & McKasy, P.A., Glen E. Schumann, and David Larson's Motion for Summary Judgment (Doc. No. 39) is **GRANTED**.

a.    Counts One, Two, and Four of the Complaint are **DISMISSED WITH PREJUDICE;**

b.    Counts Three and Five are **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  December 22, 2005          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   Judge of United States District Court